

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-4-2007

# Ogden Fire Co No 1 v. Upper Chichester Twp

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2297

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Ogden Fire Co No 1 v. Upper Chichester Twp" (2007). *2007 Decisions.* Paper 315.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/315

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATE COURT OF APPEALS
FOR THE THIRD CIRCUIT

06-2297/07-1694

OGDEN FIRE COMPANY NO. 1;
SPRINT SPECTRUM, L.P.

Appellees

v.

UPPER CHICHESTER TOWNSHIP; ZONING HEARING
BOARD OF UPPER
CHICHESTER TOWNSHIP,

Appellants

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(05-cv-01031)
District Judge: Hon. John R. Padova

Argued: May 21, 2007

Before: McKee, Ambro, <u>Circuit Judges</u> and
Ackerman,[*] <u>District Judge</u>

---

[*]The Honorable Harold Ackerman, Senior District Judge of the United States District Court for the District of New Jersey, sitting by designation.

(Opinion filed: October 4, 2007  )

JOHN J. RENDEMONTI, ESQ. (Argued)
14 Regency Plaza
Glenn Mills, PA 19342
HOWARD J. GALLAGHER, III, ESQ.
Gallagher & Gallagher
18 East Second Street
P.O. Box 348
Media, PA 19063
*Attorneys for the Appellants*

RUDOLPH GARCIA, ESQ. (Argued)
Buchanan, Ingersoll & Rooney PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103
JOHN JAY WILLS, ESQ.
4124 Chichester Avenue
Boothwyn, PA 19061
*Attorneys for the Appellees*

**OPINION**

McKEE, <u>Circuit Judge</u>.

Upper Chichester Township and the Zoning Hearing Board of Upper Chichester Township appeal two orders of the district court reversing a determination of the Zoning Hearing

2

Board based upon the district court's conclusion that the denial of requested zoning approvals and a building permit violated the Telecommunications Act of 1996. For the reasons that follow, we will affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ogden Fire Company No. 1 ("Ogden"), is a volunteer fire company that provides fire, ambulance, and rescue services to the residents of Upper Chichester Township, Delaware County, Pennsylvania and surrounding areas. It responds to approximately 550 requests for assistance per year. Ogden's firehouse is located in a zoning district that is classified as an R-2 Medium Density Residential District. Ogden uses the Delaware County Emergency Radio Center radio service (the "County System"), which is a 500 MHZ system with three repeaters located throughout Delaware County. This system is associated with the 911 system. Ogden experiences coverage

3

problems in certain areas of the Township. To make matters worse, the County System is not accessible to all public-safety personnel.

Ogden also shares a 150 MHZ radio system (the "Local System") within the Township with other fire companies, local police, school crossing guards and street maintenance crews. However, the Local System does not have repeaters and cannot reach all areas of the Township. The resulting gap in coverage over the Local System has resulted in problems that include fire fighters not being able to communicate with police. The problems have been building for the last ten years and occur on an almost daily basis. In fact, according to testimony on this record, poor radio communication has contributed to the deaths of two people.

Sprint Spectrum, L.P .("Sprint"), provides personal communications services ("PCS") over a network of wireless

4

telecommunications facilities ("WCF") pursuant to a license from the Federal Communications Commission ("FCC"). Portable telephones and devices using PCS technology operate by sending and receiving radio signals transmitted between the telephone or device and antennas mounted on towers, poles, buildings or other structures. The antennas are connected to transmitters that transmit the signals over landlines that are part of the national telephone network. These antennas and the related equipment are commonly known as a "cell site," and the surrounding area serviced by the antenna, and its associated equipment, is commonly referred to as a "cell."

Telecommunication providers cannot provide reliable service to mobile customers unless there is a continuous series of overlapping cells arranged in a honeycomb-like grid. Absent such interwoven fields of coverage, a user experiences unreliable service upon entering an area without a functioning

5

cell. These problems include the inability to make or receive calls as well as dropped, interrupted, and/or unintelligible calls.

Because portable telephones have very little power, they need to be within two miles of a cell site to function properly, and, the quality of the communication decreases as the distance to the cell site approaches the two mile perimeter. Accordingly, the cells must be closely placed. Sprint's engineers use complex computer programs to determine appropriate locations for cell sites based upon such variables as the boundaries of the cell, topography, and any physical obstructions within the area of coverage.

In order to correct the problems it has encountered with its communications system, Ogden proposed building a radio operations center inside its firehouse at 4300 Naamans Creek Road and a 130 foot radio tower in the rear yard of the firehouse. It is, however, difficult for a volunteer fire company

6

to afford the construction costs of such a project. Accordingly, Ogden and Sprint entered into an agreement that would have addressed Ogden's communications problem and safety concerns while alleviating Sprint's problems with the gaps in its coverage in the vicinity of Ogden's firehouse.

Pursuant to that agreement, Ogden and Sprint (hereinafter referred to jointly as "Ogden/Sprint") filed a joint application with the Zoning Board on August 31, 2004, for approval of the erection of a steel monopole 130 feet high for mounting emergency service and wireless telecommunications antennas. With Sprint's antennas on the top of the monopole would increase the total height of the tower to 133 feet. Sprint was to install the tower to meet both its needs and Ogden's needs and then pay monthly rent to Ogden. The Zoning application asked the Board to:

(1) find that the proposed monopole and related

7

radio equipment are permitted as an accessory use to the permitted fire company use on the subject property pursuant to § 303.1 or § 304 of the Zoning Ordinance;[1] (2) grant a variance from the height limitation of § 305.8 of the Zoning Ordinance; (3) approve a special exception for Sprint's proposed wireless communications facility pursuant to §§ 303.7, 1814 and 2106(2) of the Zoning Ordinance; or, in the alternative, (4) grant a variance from the use provisions of § 302 of the Zoning Ordinance to allow the proposed monopole, equipment and use.

*Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, No. 05-1031, 2006 WL 851391, *2 (E.D. Pa. Mar. 30, 2006) ("*Ogden I*").

During the zoning hearings that followed, Ogden/Sprint presented the testimony of several witnesses to establish that: the tower and equipment were necessary, the tower was an

---

[1] In 1969, the Township Zoning Hearing Board had granted a special exception to Ogden to use its property as a "public use" under § 303.1 of the Township's Zoning Ordinance.

8

accessory use to the firehouse,[2] Ogden's use of the tower would be "a municipal or public use," the tower would satisfy the special exception criteria regarding the height of the monopole as an "accessory structure," and, if not, that Ogden/Sprint were entitled to a variance. They also asked the Board to recognize that other carriers providing functionally equivalent services have been granted greater relief than that requested by Ogden/Sprint, and that the proposed monopole/tower was the least intrusive means of addressing Sprint's gap in coverage in the Township.

## A. The Zoning Board's decision.

On February 10, 2005, the Zoning Board denied the

---

[2] The Zoning Ordinance defines "accessory uses" to include: "any accessory use on the same lot with and customarily incident to any of the uses permitted above and not detrimental to the neighborhood." Zoning Ordinance, §§ 204, 304.

9

application in a written opinion that treated the joint application of Ogden/Sprint as one filed solely by Sprint. According to that interpretation, Sprint was requesting Zoning Board approval to construct its own WCF tower, and Ogden would thereafter attach its radio antenna to the tower to enhance Ogden's communication systems. The Zoning Board concluded that Sprint had not established the propriety of erecting a stand-alone WCF tower in an R-2 Residential District. The Board concluded that the WCF was not an accessory structure to the firehouse because it was not a use "customarily incidental and subordinate to the principal use of the land or building and located on the same lot with such principal use." *Ogden I*, 2006 WL 851391 at *3. The Board also refused to grant the special exception required to build a tower taller than 15 feet because the WCF is not an accessory use or structure to the firehouse. The Board refused to grant a special exception to build the

WCF because stand-alone WCF towers are not permitted in R-2 Residential Districts. Finally, the Board also rejected the alternate request for a variance because a 133 foot stand-alone WCF tower is not a structure permitted in an R-2 Residential District and because Sprint had not satisfied the requirements for a variance under the Pennsylvania Municipal Planning Code.

## II. DISTRICT COURT PROCEEDINGS

Ogden/Sprint responded by filing a joint complaint against the Township and Zoning Board (hereinafter collectively referred to as the "Township") in district court alleging violations of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332, and related claims. In Count I, Ogden/Sprint alleged that the Township violated 47 U.S.C. § 332(c)(7)(B)(i)(I) by unreasonably discriminating among providers of functionally equivalent services in denying

11

Ogden/Sprint's joint application despite having previously approved a similar application filed by Reliance Hook and Ladder Co. No. 1 and Metro Phone in an R-2 Residential District, and having also previously approved the application of AT&T Wireless to build a telecommunications tower in an R-1 Residential District. Count II alleged that the Township violated 47 U.S.C. § 332(c)(7)(B)(iii) because the denial of the Ogden/Sprint application was not supported by substantial evidence. Count III asserted various causes of action under state law that we need not address.

After the close of discovery, the parties filed cross-motions for summary judgment. In a very thorough and well reasoned Memorandum Opinion, the district court granted summary judgment in favor of Ogden/Sprint on their claims under the TCA. *See Ogden I*, 2006 WL 851391. In ordering relief, the court ordered the Township:

12

to grant the application of Ogden Fire Co. No. 1 and Sprint Spectrum, L.P., to build a 130 foot monopole radio tower and related radio equipment as an accessory use to Ogden's use of its property as a firehouse and to issue the Plaintiffs the requested special exceptions in accordance with Zoning Ordinance §§ 1706 and 303.7. Upper Chichester Township shall issue any and all zoning permits for the proposed tower and supporting structures within 30 days of the date of this Order.[3]

*Id.* at *21. The Township has appealed that Order. That appeal is No. 06-2297.

On May 3, 2006, the Zoning Board granted the special exceptions to Ogden/Sprint. However, Ogden/Sprint's

---

[3] In *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999), the Court of Appeals for the Second Circuit commented that "[t]he TCA does not specify a remedy for violations of the cellular siting subsection." *Id*. However, "[t]he majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." *Id.* (citations omitted). In *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp. ("Pine Grove II")*, 181 F.3d 403, 410 (3d Cir. 1999), we held that "[i]njunctions are proper forms of relief under § 332(c)(7)(B)(v)." Inasmuch as the district court's order was in the form of an injunction, it remains in effect and must be complied with during the pendency of this appeal. *See* Fed.R.Civ.P. 62(a).

application for a building permit in order to build the radio tower was denied by the Township's Building Inspector because the Building Inspector determined that the lease[4] of that portion of Ogden's rear yard to Sprint where the radio tower was to be built was the division or allocation of land by means of a leasehold. According to the Building Inspector, it therefore required the approval of a Subdivision and Land Development Application pursuant to the Township's Subdivision and Land Development Ordinance and Section 107(a) of the Pennsylvania Municipalities Planning Code ("MPC"). Ogden/Sprint thereafter filed a motion to compel the issuance of a building permit in district court and requested monetary sanctions.

On January 17, 2007, the district court issued an Order-Memorandum. *Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, No. 05-1032, 2007 WL 137848 (E.D. Pa. Jan. 17, 2007)

---

[4] Rather than assigning Sprint a position on the radio tower, Ogden leased 2,500 square feet of its real property to Sprint for the purpose of constructing, operating and maintaining the tower and related equipment.

14

("*Ogden II*"). It noted that under Pennsylvania law, leases which allocate land, as opposed to assigning positions on a pole or tower, constitute a subdivision or allocation of land pursuant to § 107(a) of the MPC. *Id.* at \*2 (citing *Upper Southampton Twp. v. Upper Southampton Twp. Zoning Hearing Board*, 885 A.2d 85, 92 (Pa. Commw. Ct. 2005), *appeal granted*, 895 A.2d 1265 (Pa. 2006)). However, the district court reasoned that there was nothing in the record before it that would support the denial of a Subdivision and Land Development Application or the issuance of a building permit. *Id.* at \*3. Therefore, it reasoned that a remand to the Township for consideration of a Subdivision and Land Development Application and for a building permit would frustrate the intent of the TCA. *Id.* Accordingly, the court directed the Township to show cause why an injunction should not be entered requiring the grant of land development and subdivision approval and issuance of a building permit. *Id.* After more briefing, on February 15, 2007, the court ordered the Township to "issue all necessary approvals

and permits for the building of the 130 foot monopole radio tower and related radio equipment in accordance with the Application for Plan Examination and Building Permit of Sprint Spectrum, L.P., dated August 31, 2006."

The Township has filed an appeal from that order. That appeal is No. 07-1694. On March 9, 2007, at our direction, the Clerk consolidated the Township's appeals for purposes of scheduling and disposition. Each appeal is discussed separately below.

## III. THE TELECOMMUNICATIONS ACT OF 1996

Congress enacted the TCA to "provide 'a pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition.'" *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 473 (3d Cir. 1999) (quoting H.R. Rep. No. 104-458 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 10, 1124).

In order to achieve that goal without interfering with the traditional right of local governments to regulate land use, "Section 322(c)(7) of the TCA expressly preserves the traditional authority enjoyed by state and local government to regulate land use and zoning, but places several substantive and procedural limits upon that authority when it is exercised in relation to personal wireless service facilities." *Id.*

The cellular siting subsection of the TCA provides as follows:

> (7) Preservation of local zoning authority.
> (A) General authority. Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
> (B) Limitations.
> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof --
> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

17

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that in inconsistent with clause (iv) may petition the Commission for relief.

47 U.S.C. § 332(c)(7).

"Traditionally, the federal courts have taken an extremely deferential stance in reviewing local zoning decisions, limiting the scope of inquiry to the constitutionality of the zoning decision under a standard of rational review." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999) (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981)). However, the TCA altered that traditional deference in very important ways insofar as local decisions interfere with, or impact upon, telecommunications facilities. Thus, "[a]lthough Congress explicitly preserved local zoning authority in all other respects over the siting of wireless facilities, § 332(c)(7)(A), the method by which siting decisions are made is now subject to judicial oversight, § 332(c)(7)(B)(v)." *Id*. Moreover, "denials subject to the TCA are reviewed by [the] court [of appeals] more closely than standard local zoning decisions." *Id*. With this framework as our guide, we address the issues that arise from the Township's decisions here.

19

## IV. THE TOWNSHIP'S APPEAL (No. 06-2297)

The Township's appeal of the district court's order reversing the decision of the Zoning Board and granting summary judgment to Ogden/Sprint is subject to plenary review. *See, e.g., Jensen v. Potter*, 435 F.3d 444, 448 (3d Cir. 2006). We limit our review of the claim that the Zoning Board's rejection of the joint application was not supported by "substantial evidence" to the record as it existed when the zoning decision was made. *See Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002). However, we review Ogden/Sprint's claim of unreasonable discrimination under the TCA on the record as supplemented in the district court. *See Nextel West Corp. v. Unity Twp.*, 282 F.3d 257, 266-67 (3d Cir. 2002).

### A. Substantial Evidence

As noted previously, the TCA requires that a decision "to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial

20

evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). "Substantial evidence is a legal term of art." *Omnipoint Commc'ns Enters, L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 248 F.3d 101, 106 (3d Cir. 2001). "It does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation and internal quotations omitted). In reviewing a record for substantial evidence, we do not "weigh the evidence contained in [the] record or substitute [our] own conclusions for those of the fact finder, but rather [we are] to determine whether there is substantial evidence in the record as a whole to support the challenged decision." *Id*. (citation and internal quotations omitted). "[We] view[] the record in its entirety and take[] account of evidence unfavorable to the agency's decision." *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp. ("Pine Grove II")*, 181 F.3d 403, 408 (3d Cir. 1999) (citation omitted). "The substantial evidence test applies to findings made by a zoning hearing board under the

21

locality's own zoning requirements." *Id*.

The district court found that the Township's denial of Ogden/Sprint's application was not supported by substantial evidence on two distinct, but related grounds. The court granted summary judgment to Ogden/Sprint because the Township treated their joint application as the sole application of Sprint for a stand-alone WCF tower, rather than as the joint application of Ogden and Sprint to allow Ogden to erect a radio tower for its own benefit, with Sprint thereafter attaching an antenna by special exception. *Ogden I*, 2006 WL 851391 at *12. The court also concluded that the denial of the special exception was not supported by substantial evidence in the written record. *Id*. at *19. The Township challenges both findings.

### (1). Joint Application of Ogden and Sprint versus Sole Application by Sprint

The Zoning Board explained its insistence on treating the zoning application as Sprint's application rather than a joint

application filed by Ogden and Sprint as follows:

> This appeal by Sprint is and can only be a request for approval of a Wireless Communication Facility, and not solely as a tower to improve the radio signal of the fire company. There is no doubt that the appeal is for a permit to erect a WCF tower and to operate a WCF by a FCC licensed provider of cellular telephone service. The board cannot ignore that the appeal is by Sprint Spectrum LP, and that the testimony offered by Sprint on the record relates to a cellular telephone service. Although there was testimony that the fire company would be permitted to place its radio transmission equipment on the WCF, that does not convert this application into anything other than a Wireless Communication Facility for the transmission of cellular telephone service. In fact, section 1814 5.E of the ordinance requires that local police, fire, and ambulance companies be specifically offered co-location on a WCF tower.

Joint Appendix (JA) at 553.

As the district court observes, this finding was fatal to the zoning application because the zoning ordinance clearly prohibits the siting of a stand-alone WCF tower in an R-1 or R-2 Residential District. *See Ogden I*, 2006 WL 851391 at *11 (citing Zoning Ordinance §§ 203, 303.7, 803, 903, 1003, 1103).

23

In explaining its decision to ignore Ogden's interest in the application, the Township insisted, according to the district court, that "no matter how cleverly . . . worded, the Application is an application for Sprint to build a WCF as a stand-alone tower on Ogden's property, a use which is not permitted in an R-2 Residential District under the Zoning Ordinance." *Id*. at *10. The district court disagreed. The court held that the application "was submitted to the Zoning Board as a joint application [by Ogden and Sprint] to build a radio tower for Ogden as an accessory use to Ogden's use of the property as a firehouse and for Sprint to attach a WCF antenna to that tower." *Id.* at *10. The court explained:

> [T]he Zoning Board's decision to treat the Application as an application brought solely by Sprint for the siting of a stand-alone WCF tower in an R-2 Residential District, rather than as a joint application to erect a radio tower to benefit Ogden, on which Sprint could attach an antenna by special exception, is not supported by substantial evidence in the written record. The Court further finds that the Zoning Board's decision to ignore Ogden's request to build the tower on its property as an accessory use to the

24

firehouse is not supported by substantial evidence in the written record.[5]

*Id*. at *12.  Given Judge Padova's thorough legal analysis, and

his meticulous review of the Zoning Board's factual

[5] Because the Zoning Board viewed the application as filed by Sprint alone for Sprint to build a WCF as a stand-alone WCF tower on Ogden's property, the Board did not consider that portion of the application in which Ogden sought to erect the tower on its property as an accessory use to the permitted fire company use.  The Board wrote that it "specifically does not render any opinion as to whether or not an antenna or tower for transmission of radio signals to be used by a fire company alone, is an accessory use or constitute [an] accessory structure."  JA at 554.

Ogden/Sprint contend that in construing the application as Sprint's alone and in not deciding that the radio was an accessory use to Ogden's fire station, the Zoning Board failed to decide the application as actually submitted and failed to decide Ogden's request at all.  Accordingly, they argue that the application as submitted is deemed approved under state law.  There is a considerable force to that argument.  Under Pennsylvania law, a zoning board "shall render a written decision . . . on the application within 45 days after the last hearing before the board . . . ," but "where the board fails to render a decision within the period required by this subsection . . . , the decision shall be deemed to have been rendered in favor of the applicant."  53 PA. CONS. STAT. ANN. § 10908(9). *See Relosky v Sacco*, 523 A.2d 1112 (1987).  Nevertheless, because these appeals raise important federal issues under the TCA, we are reluctant to resolve this case on that basis, and we will address the merits of the arguments that are raised by the parties.

conclusions, we can best dispose of the Township's challenge to the district court's order by quoting extensively from Judge Padova's Memorandum Opinion. In rejecting the Township's redefinition of the Ogden/Sprint application, the court explained:

> [The Township's] position is belied by the Application, which states plainly that it is an application filed by Sprint and Ogden for a "[s]teel monopole 130 feet in height for mounting emergency service (fire company) and wireless [t]elecommunications (PCS) antennas." Indeed, the background section of the Application states that:

> Ogden currently operates a radio system from its property, but that radio system lacks adequate coverage in parts of its service area. Installation of a repeater radio on a tower of substantially greater height will substantially improve its radio communications and thus the safety and efficiency of this [sic] volunteers. Ogden desires to make this improvement. The proposed monopole will meet this need.

*Id*. at *11.

The Township does not directly claim that the district court's finding of a joint application was clearly erroneous.

Rather, the Township relies upon certain provisions of the lease agreement between Ogden and Sprint to support its contention that the zoning application was solely Sprint's application.[6] Ogden/Sprint argue that the Township did not raise the issue of their lease in the district court and that it is therefore waived. *See Delaware Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006) ("Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal."). Assuming *arguendo* that the argument is not waived, it can readily be rejected as meritless.

The Township's reliance on the provisions of a lease between the two applicants ignores the very nature of the zoning application process. Zoning regulations govern the *use* of the land. *Frederick v. Zoning Hearing Bd. of Conewago*

---

[6] The Township refers to a lease agreement that was offered as an exhibit at the zoning hearing, and certain provisions of the lease which appear to give Sprint the sole ownership of, and control over, the monopole tower as well as any equipment attached to it. According to the Township, the unilateral nature of the terms of that lease can only mean that the zoning application was really for the sole benefit of Sprint.

*Twp.*, 713 A.2d 139, 141 (Pa. Commw. Ct. 1998) (citation omitted). "Zoning regulations concern the physical use to which land is put. Zoning laws, enactments under the police power, are not concerned with the method of ownership of property. . . . [I]f a use is permitted, a municipality may not regulate the manner of ownership of the legal estate." *Id.* (citation omitted). Accordingly, actual ownership of the proposed tower is as irrelevant as the relationship between Ogden and Sprint insofar as the zoning application is concerned.

Moreover, the Zoning Board's focus on the nature and extent of Sprint's involvement totally obfuscated the Zoning Board's inquiry and analysis. The question before the Zoning Board was whether the proposed *use* of the radio tower would be accessory to the firehouse; the issue was not the respective rights of the applicants, nor the nature of the interest of each under the terms of their lease. Accordingly, the district court correctly rejected the Township's effort to view the joint

28

application of Ogden and Sprint as the sole application of Sprint.

**(2). Substantial Evidence**

Ogden/Sprint applied for two special exceptions for the siting and construction of the radio tower. Pursuant to § 1706.2 of the zoning ordinance they sought a special exception to build a tower higher than the height limitation for accessory structures.[7] They also sought a special exception pursuant to § 303.7 of the zoning ordinance to attach a WCF antenna to that tower.[8]

A "special exception" in zoning law is "a conditionally permitted use, allowed by the legislature if specifically listed

---

[7] Zoning ordinance § 1706.2 provides that "[n]o accessory structure shall be more than one (1) story or fifteen (15) feet in height, except when a greater height is permitted by special exception in the case of any accessory to a non-residential use."

[8] Zoning ordinance § 303.7 allows a WCF "with Antenna attached to a nonresidential building or structure of a permitted . . . municipal or governmental building or facility, and a building or structure owned by a public utility" in an R-2 Residential District as a use permitted by special exception.

standards are met." *In re Brickstone Realty Corp.*, 789 A.2d 333, 340 (Pa. Commw. Ct. 2001) (citation omitted). Thus, a special exception is not really an *exception* at all. Rather, it is "a use permitted conditionally, the application for which is to be granted or denied by the zoning hearing board pursuant to express standards and criteria." *Id.* (citation omitted). "Where a particular use is permitted . . . by special exception, it is presumed that the local legislature has already considered that such use satisfies local concerns for the general health, safety, and welfare and that such use comports with the intent of the zoning ordinance." *Id.* (citation omitted).

Once an applicant for a special exception establishes it has complied with the controlling ordinance, the applicant is entitled to a presumption that the requested use "is consistent with the promotion of health, safety, and general welfare." *Id.* (citation omitted). Accordingly, "[t]he burden then shifts to objectors to prove that the proposed use is not, in fact, consistent with the promotion of health, safety, and general

30

welfare." *Id.* (citation omitted).

In order to receive approval pursuant to § 1706.2, Ogden/Sprint had to satisfy the conditions for special exception listed in § 1802 of the zoning ordinance. That section requires the Zoning Board to consider, where appropriate, the following factors in considering a request for a special exception:

> a. That the proposed use is consistent with the statement of community objections per Section 103 and the statement of purpose for the district in which it is proposed.[9]
>
> b. That the proposed use is appropriate for the site in question in terms of size, topography, natural features, [and] drainage, . . . .
>
> c. That the proposed use is compatible with the

---

[9] The statement of community objectives provided in § 103 state that this "Zoning Ordinance is intended to implement the principles, policies and objectives of the Comprehensive Plan and to guide and regulate the orderly growth and development of Upper Chichester Township." Zoning Ordinance § 103. The statement of purpose for R-2 Residential Districts provides that such districts "are to provide for continued medium density suburban type, single-family residential development; to preserve existing medium density development and open space; and to provide for and regulate certain uses permitted [by] special exception." Zoning Ordinance § 301.

character of the surrounding neighborhood, will not interfere with or detract from legitimate uses and adjacent properties, and that adequate measures will be provided through . . . site layout, landscaping, [and] planting . . . to minimize any adverse impacts caused by noise, lights, glare, odors, smoke, fumes, traffic, parking, loading and signage.

d. That the proposed use will serve the best interest of the Township, convenience of the community and the public health, safety and welfare.

e. That the proposed use is consistent with the Township Comprehensive Plan.

f. That the proposed use promotes orderly development, proper population density and the provision of adequate community facilities and services, including police and fire protection.

Zoning Ordinance § 1802.1

In order to receive permission to attach Sprint's WCF antenna to the tower as a special exception pursuant to § 303.7, Ogden/Sprint had to satisfy the relevant conditions contained in § 1814 of the zoning ordinance. That section required the following:

A. The applicant shall demonstrate, using

accepted technological evidence, that the Antenna and Antenna Support Structure must be located where proposed in order to satisfy its function in the applicant's grid system.

B. If the applicant proposes to build a Tower (as opposed to mounting the Antenna on an existing tall structure), it is required to demonstrate that it contacted the owners of tall structures within a one-mile radius of the site proposed, requested permission to install the Antenna on those tall structures and was denied permission for reasons other than economic reasons. . . . If the Antenna can be physically and legally accommodated on an existing tall structure, the Township may deny the application to construct a new Tower.

C. The applicant shall demonstrate that the Antenna Height is the minimum required to function satisfactorily. . . .

D. The applicant shall demonstrate that the proposed Antenna and Antenna Support Structure are safe and the surrounding properties will not be negatively affected by Antenna Support Structure failure, falling ice or other debris. . . .

E. [T]he proposed Antenna Support Structure shall be required to accommodate, where possible, other users including . . . local police, fire and ambulance companies. . . .

F. The applicant must demonstrate that it is licensed by the Federal Communication Commission (FCC) to provide wireless

communications. . . .

G.   As the wireless communications facility is fully automated, adequate parking shall be required for maintenance workers.

H.   Antenna Support Structures shall, to the extent possible, be finished so as to reduce the visual impact. . . .

I.   A full site plan shall be required for all Landsites. . . .

J.   A plan shall be required for all WCF . . . to illustrate the relationship between the proposed facility and the adjacent structures and property lines.

K.   Towers shall be designed and constructed to all applicable standards of the American National Standards Institute. . . .

L.   A soil report . . . shall be submitted to the Township. . . .

M.   Towers and Antenna shall be designed to withstand wind gusts of at least 100 miles per hour.

N.   An Antenna may not be located on a building or structure that is listed on the Township's Historic Resources Map.

O.   No Antenna or its support structure may be artificially lighted except when required by the

Federal Aviation Agency.

P. Applicant shall maintain with the Township the current name, address and emergency telephone number of the owner or operator. . . .

Zoning Ordinance § 1814.5.

During the hearing before the Zoning Board, Ogden/Sprint presented the testimony of a civil engineer, James Rudolph, and submitted a plan showing the relationship between the proposed tower and the adjacent structures and property lines. The plan also showed the vegetation on Ogden's property, including existing stands of mature trees, which, according to Rudolph, would act as buffers. Rudolph testified that the tower and antenna would be designed by a licensed professional engineer consistent with all applicable codes. Rudolph also stated that the completed tower would withstand wind gusts of up to 100 miles per hour, not pose any safety concerns, provide for adequate storm water management, comply with landscaping and soil requirements, and would not affect the use of adjacent properties. Furthermore, the tower

35

and necessary communications equipment would not affect traffic conditions or generate noise and would be unlighted except for a work light that could be turned on when needed, and that there was already adequate parking at the site for maintenance personnel. The distance from the radio tower to each of the neighboring properties would be greater than the tower's height, preventing damage to neighboring properties caused by the tower's falling or dropping ice and that there would be a multi-agency 911 cabinet for Upper Chichester. He testified that Ogden/Sprint would install additional trees to add to the existing buffer along Ogden's property lines and that the proposed tower would not alter the essential character or essence of the surrounding neighborhood.

Ogden/Sprint also submitted the expert report of Dr. Ken Foster, an expert on the health effects of radio frequencies. He opined that the tower and communications facility would comply with all applicable FCC standards regarding electromagnetic radiation. In addition, Clement Poole, a radio

36

frequency engineer, testified about studies he performed regarding Sprint's weak wireless communications service in the area of Naamans's Creek Road, where the Ogden firehouse is located. These studies included testing PCS coverage at nearby tall towers to see if Sprint could solve its service problems by attaching an antenna to an existing tower. He determined that the Ogden location was the best one. He also concluded that if Sprint were not permitted to attach an antenna to the proposed tower, Sprint would have poor to no service in that area, and that the proposed tower was the minimum required to alleviate Sprint's coverage problems.

William T. Robinson, former Township Police Chief and Vice President of Ogden, testified that the facility would benefit the public health, safety and welfare by enhancing communications between the fire company, the Township, School District and community.

As the district court observed, "[d]espite the evidence presented by [Ogden/Sprint] in support of their Application,

37

which satisfies the relevant requirements of §§ 1802 and 1814 of the Zoning Ordinance, the Zoning Board found that the proposed tower did not satisfy these factors." *Ogden I*, 2006 WL 851391 at *16. The Zoning Board concluded:

> (1) That the proposed use is not consistent with the statement of community objectives per Section 103 and the statement of purpose for the district in which the use is proposed.
>
> (2) That the proposed use is not appropriate for the site in question in terms of size, topography, natural features, and that adequate provisions were not provided to protect sensitive environmental features.
>
> (3) That the proposed use is not compatible with the character of the surrounding neighborhood, will interfere with or detract from legitimate uses and adjacent properties.
>
> (4) That the proposed use will not serve the best interest of the Township, convenience of the community and the public health, safety and welfare.
>
> (5) That the proposed use is not consistent with the Township Comprehensive Plan.
>
> (6) That the proposed use will not reflect effective site planning and design in terms of energy efficiency, environmental protection and

aesthetic composition.

The Zoning Board based these conclusions on the following findings of fact:

1. That Appellant proposes to erect a 133 foot stand alone WCF tower for transmission and/or reception of Wireless Communication Services as defined in the Ordinance and that the tower will accommodate the needs of Ogden Fire Company with respect to enhancing the Fire Company's radio signal.

2. That the principal use of the proposed tower is to operate as a WCF Antenna.

3. That Appellant is located in an R-2, Medium Density Residential District.

4. That the Appellant, the Ogden Fire Company [,] is an existing non-conforming use pursuant to the ordinance.

5. That a single 133 foot tower is not the only means by which Appellant could ameliorate or correct its alleged lack of adequate service in the area around the Ogden Fire Company.

6. That there exist other solutions to help ameliorate the alleged lack of service other than to erect a single 133 foot stand along WCF tower at Appellant's location.

7. That there is adequate wireless communication

39

service in the area around Ogden Fire Company provided by other providers of Wireless Communication Services.

8. That Appellant did not propose a WCF antenna to be "attached to a nonresidential building or a structure of a permitted church, educational, public, municipal or governmental building or facility, and a building or structure owned by a public utility regulated by the Pennsylvania Utility Commission" which is permitted as a Special Exception in an R-2 Residential District.

9. That Appellant did not produce evidence from the owners of other structures and tall structures in the area around Ogden Fire Company refusing to allow Appellant to attach an antenna to their existing structures and tall structures.

10. That a 133 foot stand alone tower will adversely affect the property values of the immediately adjacent residential properties.

The district court properly rejected most of the Board's findings out of hand. The court ruled that Findings of Fact 1, 2 and 8 were based on the Zoning Board's mischaracterization of the application as solely Sprint's request to build a stand-alone tower. Those three findings were irrelevant to whether Ogden/Sprint's joint application satisfied the requirements for

special exceptions contained in zoning ordinance §§ 1802 and 1814. *Id.* at *17. Similarly, Finding of Fact 9 concerns a condition that must be met only if the applicant wants to build a stand-alone WCF tower. Thus, the district court also considered Finding of Fact 9 irrelevant to the issue of whether the application met the requirements for the special exceptions actually requested. *Id*. The court concluded that Finding of Fact 3 (the application involved an R-2, Medium Density Residential District) was correct. *Id*. Indeed, this was not contested. However, the court then noted that Finding of Fact 7 (adequate wireless communication service in the area of Ogden's property provided by other wireless providers) was not at all responsive to any of the conditions for special exceptions listed in §§ 1802 and 1814. *Id*. That finding was, therefore, irrelevant to whether the application met the requirements for the requested special exceptions. *Id*. The court concluded that Finding of Fact 4 was incorrect because the Zoning Board had granted Ogden a special exception to locate a firehouse on its

41

property as a public use on June 19, 1969, under § 303.1 of the Zoning Ordinance. *Id.*

The district court explained that the only evidence supporting Findings of Fact 5 and 6 (a single 133 foot tower is not the only means by which Sprint could correct its service problems and there are other solutions for those service problems) was the evidence submitted by Karen Beck, an objector who appeared before the Zoning Board. *Id.* She testified that Sprint could solve its service problems by attaching an antenna to another tall structure in the area or by placing a tower somewhere else, but she conceded that she was not an expert in telecommunications. *Id.* Despite her lack of expertise, she testified about a tower in a neighboring township purportedly having a height of 420 feet; 90 feet higher that the proposed Sprint tower. *Id.* Beck also submitted pictures of some of these structures. She claimed that there was no need for the tower described in the Ogden/Sprint application. *Id.*

The district court was not convinced by Beck's testimony

because there was "no evidence that any of the areas [Beck] identified . . . [are] located within one mile of the Ogden firehouse, the location where Sprint claims it needs to put a WCF antenna in order to close its gaps in service." Id. Accordingly, it found that Findings of Fact 5 and 6 are not supported by substantial evidence. Id.

The district court held that Finding of Fact 10 (a 133 foot stand-alone tower will adversely affect the property values of the immediately adjacent residential properties) was supported only by testimony that the proposed project would lower property values of some of the neighbors. Id. at *18. That testimony was also offered by objectors who testified before the Zoning Board. Arthur Sokolove, a spokesman for others living near the firehouse, testified about the neighbors' concerns that they will be unable to sell their homes if the tower is built. Sokolove testified that he would not have bought his house if the proposed tower had been on Ogden's property. Id. Another objector, Linda McDonald, testified about her internet research

43

into property values. Her research disclosed that houses in New York that were near towers sold for ten to twenty-five percent less than houses that were not. *Id.* McDonald also testified that she spoke with real estate agents and learned that houses near towers take longer to sell and will sell for less when finally sold. *Id*. The district court was not convinced by McDonald's testimony because she never identified the source of her internet research, nor the agents to whom she spoke. Regina Hartney, who does not live near the Ogden property, but who once worked as a realtor, testified that the vast majority of people would not choose to buy a home with a 100 foot tower in their backyard if they have a choice. *Id.* On appeal, the Township reasserts the value of Hartney's testimony by describing her as "not paid by any party, but an aggrieved party, [who] was qualified to give an opinion on the question as to whether a 130 foot monopole erected on the property adjacent to the homes in the neighborhood would negatively impact the value of these homes." Township's Br. at 25. However, the district court

44

noted that Hartney did not take a poll or perform an actual study of the impact of a radio tower on the price of nearby homes. *Id.* Indeed, she explicitly admitted: "I'm not trying to tell you that I have documented data. Joint Appendix at 342, ZHB Hearing at 318-20.

Given the district court's rejection of the Zoning Board's findings, the court held that the Board's denial of the application was not supported by substantial evidence in the written record. *Id*. at *19. The Township contends that this was error and it advances a number of arguments in support of that contention. First, the Township argues that the district court improperly substituted its judgment for that of the Zoning Board in crediting Rudolph's testimony "that the proposed tower would not alter the essential character or essence of the neighborhood." *Id*. at *15. According to the Township, since the Zoning Board rejected Rudolph's testimony on this point, the court could not find that he was credible. However, the Township's argument misconstrues what the district court did.

45

It did not find Rudolph's testimony credible. Rather, it simply reiterated his testimony. As Ogden/Sprint note, the issue is not whether the district court accepted his testimony despite the Zoning Board's rejection of it. The issue is whether there was evidence to refute his testimony, and the Township points to nothing in the record to refute it on this point. The Township simply says that "it defies common sense to conclude that a one hundred thirty (130) foot monopole erected adjacent to homes in one particular neighborhood would not 'alter the essential character or essence of the neighborhood.'" Township's Br. at 24. However, that simplistic approach does not sufficiently consider the impact of the existing fire station.

As noted, the Township granted a special exception to Ogden for a "public use" for its fire station almost forty years ago under § 303.1 of the Zoning Ordinance, and the Zoning Ordinance allows for an accessory use. *See* n.1, *supra*. As also noted, the Zoning Ordinance defines an "accessory use" as "[a] use of land or of a building or portion thereof customarily

46

incidental and subordinate to the principal use of the land or building and located on the same lot with such principal use." Zoning Ordinance, Appendix (i); *see also* n.2, *supra.* "Once something is defined as an accessory use, it is allowed by right." *AWACS, Inc. v. Zoning Hearing Bd. of Newtown Twp.*, 702 A.2d 604, 607 (Pa. Commw. Ct. 1997) (citation omitted). "In order to establish that right, an applicant must prove that the use sought is secondary to a principal use and that the use is usually found with that principal use." *Id*. (citation omitted). The Zoning Ordinance also provides for, and allows, an "accessory structure." An "accessory structure" is defined as one that is "detached from a principal building on the same lot and incidental and subordinate to the principal use of the building or use." Zoning Ordinance, Appendix I.B.

Here, it is clear that the tower is an accessory use/structure to Ogden's firehouse. Robinson, Ogden's Vice-President, explained the relationship of the proposed tower to the firehouse:

47

> Communications are necessary so, essentially, this is an accessory use. If you look at communications, without it we are nowhere. We look upon redundancy in this age, particularly this age after 9/11, as critical to emergency operations. As a result we have taken action with regard to further alerting people through our cell phones, regular pagers in addition to fire pagers which we found to be inadequate in certain areas. So communication is definitely associated with any emergency service.[10]

App. 288. Accordingly, the district court quite correctly concluded that Ogden's use of "a radio tower to enhance its existing radio-communications system would be an accessory use. . . ." *Ogden I*, 2006 WL 851391 at *8.

The Township attempts to rely on *AWACS*, 702 A.2d 604, in arguing that the district court erred because the radio tower is a commercial use that is not accessory to the firehouse and therefore should not be allowed. In *AWACS*, a telecommunications company (Comcast) applied for a building permit to install 12 mobile phone antennae on the roof of an 18

---

[10] As we noted earlier, there was evidence that the poor quality of Ogden's emergency communications capabilities has contributed to two deaths in the past.

48

story apartment building. The application was denied as an unpermitted use that was not accessory to any permitted use. On appeal, the Commonwealth Court agreed stating:

> [T]he principal use of the apartment building on which the antennae were to be erected is, of course, residential. The use to which Comcast would put these antennae is a business use. The antennae would serve Comcast's customers in the area, regardless of where they live, not Newtown Towers residents alone. In fact, the antennae would not necessarily serve *any* residents of the building, unless they chose to become Comcast subscribers. In this sense, the antennae are unlike, for example, a television antenna on top of an apartment building that serves the tenants of that building as an incident to their residential use. The antennae may be a necessary part of Comcast's business use, but they are in no manner incident, subordinate or secondary to Newtown Towers' use, and may even lack a connection at all, if no Comcast subscribers reside there.

702 A.3d at 607. The Township now claims that the proposed Ogden/Sprint tower "would not serve members of the fire company unless they also subscribed to the available telephone services," and that it is therefore not a use that is incidental to

49

the fire house. Township's Br. at 40. However, this argument is once again tethered to the Board's attempt to ignore the joint nature of the Ogden/Sprint application and the Board's insistence on viewing it as an application of Sprint alone. Given that analytical entry point, the Board concluded that Sprint wanted to erect a stand-alone wireless communications tower solely for its own use to provide service to its cellular customers.[11]

It is, of course, true that Sprint's antenna is intended to provide service to Sprint's customers rather than being part of Ogden's emergency communication system. However, that is where the strained analogy to *AWACS* ends. It is abundantly clear on this record that the radio tower will be used by Ogden pursuant to its responsibility as an emergency responder. The

---

[11] "'It is true also of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out on a case depends on where one goes in.'" *United States v. Sigal*, 341 F.2d 837, 844 (3d Cir. 1965) (quoting, *United States v. Rabinowitz*, 339 U.S. 56, 69 (1950) (Frankfurter, J. dissenting)).

Zoning Ordinance allows for telecommunications uses in R-2 Residential Districts by special exception. *See* Zoning Ordinance § 303.7. As we have already noted, once something is defined as an accessory use, it is allowed by right. Because the tower is an accessory use, on this record, Sprint can surely attach an antenna to it by special exception.

While it is certainly conceivable that the proposed tower could decrease property values, and that such a decrease would qualify as reasonably detrimental to the neighborhood, that conclusion is not supported by substantial evidence in this record. The Township argues that it "should have been given the deference to reject whatever unqualified expert testimony was given to support the fantastic notion that [the monopole] . . . would not impair aesthetics, the character of the neighborhood, or negatively affect the desirability or value of the property." Township's Br. at 26. The Township fails to comprehend, however, that it *is given deference* in the form of the substantial evidence standard, but the Township failed to

clear even this rather low hurdle; rather, it made conclusory statements insufficiently buttressed by generalized notions offered by poorly qualified witnesses.

Second, the Township contends that Regina Hartney's testimony constitutes substantial evidence supporting the Zoning Board's denial of the special exceptions. However, as noted earlier, Regina Hartney, did not live near the Ogden property, but once worked as a realtor. She testified that the vast majority of people would not choose to buy a home with a 100 foot tower in their backyard if they had a choice. The district court rejected her testimony and Finding of Fact 10 that was based on it. The court explained:

> Generalized concerns about aesthetics and property values are not sufficient to satisfy the objectors' duty of presentation. The duty of presentation requires [objectors] to establish their objection with a 'high degree of probability, and raise specific issues concerning the proposal's general detrimental effect on the community. Indeed, the evidence of objectors must show a high probability of an adverse impact that will pose a substantial threat to the health and safety of the community. Mere speculation as to

52

possible harm is insufficient. (citations omitted). The United States Court of Appeals for the Third Circuit has recognized that [a] few generalized concerns about a potential decrease in property values, especially in light of [the plaintiff]'s contradictory expert testimony, does not constitute substantial evidence for the purposes of § 332(c)(7)(B)(iii) of the TCA.

*Ogden I*, 2006 WL 851391 at *18. (citations, quotation marks and footnotes omitted) (brackets in original). Thus, the district court dismissed the testimony because it amounted to nothing more than generalized expressions about aesthetics and decreases in property values that did not rise to the level of substantial evidence required under the TCA. *See Pine Grove II*, 181 F.3d at 409 ("[A] 'few generalized expressions of concerns with aesthetics cannot serve as substantial evidence' and 'a few generalized concerns about a potential decrease in property values . . . does not seem adequate to support a conclusion that the permits should be denied.'") (quoting *Oyster Bay*, 166 F.3d at 490).

The Township cites *Omnipoint Commc'ns Enters., L.P.,*

*v. Zoning Hearing Bd. of Easttown Twp.*, 72 F. Supp. 2d 512, 515 (E.D. Pa. 1999), *reversed*, 248 F.3d 101 (3d Cir. 2001), in arguing that zoning decisions linking aesthetics to property values are acceptable and appropriate. The court there did say that "decisions which link aesthetics to property values . . . are acceptable." However, the court's analysis was driven by traditional zoning considerations under Pennsylvania law. It was not considering with the application of the TCA, nor that federal statute's impact on the considerations of land use that are otherwise left to local regulation.[12]

The Township also cites to *AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment*, 172 F.3d 307 (4th Cir. 1999), in which a court of appeals reversed the district court's order granting AT&T's application for a special use

---

[12] One could forcefully argue that the erection of any telecommunications equipment would have an adverse impact on the aesthetics of any residential community. However, under the circumstances here, such an unforgiving and absolutist approach local to land use regulation would eviscerate the national policy of promoting the telecommunications industry that is endemic in the TCA.

54

permit to erect a 140 foot monopole despite the local zoning authority's rejection of that application. The substantial evidence on the record supporting the denial there included a mortgage banker's testimony that the tower would adversely affect the resale value of the homes surrounding it, and have a negative impact on the aesthetics of the community where it was planned. To that extent, it appears at first blush that the Township's focus on aesthetics does have some support in cases applying the TCA. However, *AT&T* is easily distinguished.

In *AT&T*, the tower was to be erected on private property that included a house that was listed on the National Register of Historic Places, 172 F.3d at 310, and there was "no commercial property in the neighborhood nor on the [subject] property." *Id.* Moreover, the setting was described as "a neighborhood of 'excellent quality of life and . . tranquility[,]'" and "'an unspoiled serene tract of land in the midst of a bustling city.'" *Id.* As the court noted, that testimony was offered "not by the homeowners or others opposing the special use permit, but by

55

AT&T." *Id.* There was more. Although AT&T argued that it needed the tower to address a gap in its wireless service in the city, it conceded that "this particular location was not necessary, [and that] others would do." *Id.* AT&T's engineers admitted that they could "co-locate on an existing tower, . . . [or] build another monopole tower at another location;" and that either option was satisfactory and would "preclude the necessity of having a tower on [the subject] property" while "provid[ing] the same level of service." *Id.* at n1. That is simply not our case. Given the circumstances here, the district court correctly evaluated the generalized testimony regarding aesthetics, the fact that the current use included a firehouse, and the need for the specific location where Ogden/Sprint were attempting to locate the communications tower.[13]

Third, the Township contends that the district court

---

[13] We do not, of course, suggest that all testimony regarding aesthetics is irrelevant under the TCA. We do, however, reiterate that the generalized testimony about the impact on the aesthetics of the neighborhood on this record is not the "substantial evidence" required under the TCA.

misinterpreted and/or ignored testimony that clearly established that Ogden's property was not the only site that would remedy Sprint's problem. As noted, in Findings of Fact 5 and 6, the Zoning Board found:

> 5. That a single 133 foot tower is not the only means by which Appellant could ameliorate or correct its alleged lack of adequate service in the area around the Ogden Fire Company.
>
> 6. That there exist other solutions to help ameliorate the alleged lack of service other than to erect a single 133 foot stand along WCF tower at Appellant's location.

As we explained earlier, the district court held that the only evidence supporting these findings was the testimony of Beck, which we have recited above. The court found that testimony insufficient to demonstrate that Sprint could solve its communications problems by placing an antenna on another tall structure or could build a tower elsewhere. The Township claims that holding was in error. According to the Township, the testimony of Poole, a radio frequency engineer who testified for Sprint, demonstrated that Ogden's property was not the only

site that could solve Sprint's coverage problems. We disagree with that summary of Poole's testimony. Poole testified that Sprint must have a tower on Ogden's property to solve its coverage problems even if it erected a tower somewhere else. The district court summarized the relevant portions of Poole's testimony as follows:

> Clement Poole . . testified regarding studies which he performed regarding Sprint's weak wireless telecommunications service in the area of Naamans Creek Road where the Ogden firehouse is located. These studies included testing PCS coverage at nearby tall towers to see if Sprint could solve its service problems by attaching an antenna to an existing tower. (N.T. Vol. 2 at 150-68.). He determined that the Ogden location was the best location. (*Id.* at 168.) Poole also concluded that if Sprint were not permitted to attach an antenna to the proposed tower, Sprint would have poor to no service in that area. (*Id.* at 176.) He further testified that the proposed height of Sprint's antenna on the proposed tower is the minimum height necessary to alleviate Sprint's coverage problems. (*Id.* at 177.)

*Ogden I*, at * 15.

Finally, the Township contends that Ogden/Sprint did

not produce any evidence in the application for a special exception under Zoning Ordinance § 1706.2, *see* n.8, *supra*, that the tower had to be 130 feet tall. In support of that claim, the Township excerpts portions of the testimony of Ogden's Vice President Robinson. *See* Township's Br. at 31. However, the Township ignores Robinson's testimony that 130 feet would be less than the optimum height of 150 feet, but would be close enough to fill Ogden's needs. JA at 289. Moreover, the Township completely ignores the fact that Poole stated that the proposed height of 130 feet was the *minimum* height necessary to fill Sprint's coverage gap. JA at 313. Moreover, in its submissions to the district court, the Township admitted that Odgen's "communications problems cannot be remedied without the proposed Facility at the height requested." JA at 50.19 (Township's Motion for Summary Judgment, Facts Established at the Hearings, ¶ 34).

Accordingly, we agree with the district court's conclusion that the Township's rejection of the Ogden/Sprint

application is not supported by substantial evidence.

## B. Did the Township Unreasonably Discriminate Among Providers of Functionally Equivalent Services?

As noted at the outset, Count I of Ogden/Sprint's complaint alleged that the Township's rejection of their application unreasonably discriminated among providers of functionally equivalent services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I). The Township had previously approved an application filed jointly by Reliance Hook and Ladder Co. No. 1 and Metro Phone. It had also previously approved an application to build a telecommunications tower in an R-1 District filed by AT&T Wireless. The district court granted summary judgment to Ogden/Sprint on that claim, finding that the "Zoning Board unreasonably discriminated between the Ogden/Sprint Application and the prior applications. . .". *Ogden I*, 2006 WL 851391 at *9. We agree.

### (1). General legal principles

"The TCA does not prohibit all discrimination against

60

providers, only unreasonable discrimination." *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 395 (3d Cir. 2003) (citation omitted). Section 332(c)(7)(B)(i)(I) of the TCA provides: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not unreasonably discriminate among providers of functionally equivalent services[.]" The test for unreasonable discrimination under the TCA consists of two prongs. *Nextel West Corp.*, 282 F.3d at 266. "[T]he first prong asks whether the relevant providers are 'functionally equivalent.'" *Id*. (quoting 47 U.S.C. § 332(c)(7)(B)(i). This inquiry focuses on "the telecommunications services the entity provides, not on the technical particularities (design, technology, or frequency) of its operations. *Id.* at 267 n.13. If the providers are "functionally equivalent," the "second prong asks whether the governmental body 'unreasonably discriminate[d] among providers.'" *Id*. at 267 (quoting 47

U.S.C. § 332(c)(7)(B)(i)).

Relief under the discrimination provision "will require a showing that the other provider is similarly situated, i.e., that the structure, placement or cumulative impact' of the existing facilities makes them as or more intrusive than the proposed facility." *ATP Pittsburgh Ltd P'ship v. Penn Twp.*, 196 F.3d 469, 480 n.7 (1999). "Discrimination may be impermissible where a municipality favors one provider by permitting it to locate in a particular area at the exclusion of others, thereby creating unfair competitive advantage." *Nextel West Corp.*, 282 F.3d at 267.

### (2). The Reliance/Metro Phone application

On April 1, 1992, the Zoning Board approved the joint application that Reliance Hook and Ladder Co. No. 1 and AWACS, Inc., d/b/a Metro Phone Co., submitted for a special exception. That application had obvious similarities to the one Ogden/Sprint submitted. The exception the Board granted there allowed Metro Phone to install and operate radio

62

communications equipment in the basement of Reliance's firehouse and to construct a 180 foot high radio communications tower with antennae in the rear of the firehouse. Like Ogden, Reliance is located in an R-2 Residential District.

In granting the special exception, the Zoning Board made the following findings: (1) this use was an accessory use to the fire company use and the tower was an accessory structure to the firehouse building, thus requiring special exceptions to use and height limitations; (2) the tower and radio communications equipment would facilitate Metro Phone's cellular communications system, which had a dead spot in the area of the tower; (3) a tower with a minimum height of 180 feet was required to provide proper coverage to the service area; (4) the base of the 180 foot tower would be 20 feet in diameter, tapering to 48 inches at the top; and, (5) the proposed tower would provide Reliance with a back-up communications system and, therefore, benefit Reliance's volunteer firefighting

activities and provide 911 service for Metro Phone's subscribers.

The Zoning Board also found that the cellular phone communication service was an accessory use to the volunteer fire company and that the tower was an accessory use to the firehouse because the fire company had to depend on radio communications. The proposed cellular phone communication service provided a back-up communication for Reliance and 911 service to the cellular subscribers, and allowed the county to place its emergency service equipment on the proposed tower. Accordingly, the Zoning Board granted the special exception to Reliance/Metro Phone pursuant to Zoning Ordinance § 1706.2. The application was approved prior to the Township's adoption of Ordinance No. 579.[14]

---

[14]On November 17, 1997, the Township adopted Ordinance No. 579, which amended the Township Code to provide for the use, construction and siting of WCFs. Ordinance No. 579 amended § 303 of the Zoning Ordinance to permit "WCF with antenna attached to a nonresidential building or structure of a permitted church, educational, public, municipal or governmental building or facility" as a special

In granting summary judgment to Ogden/Sprint on Count I, the district court concluded that Ogden would use the radio tower in its capacity as an emergency responder. That use would enhance Ogden's existing radio communications and it was therefore an "accessory use not a commercial use as the Township claimed." *Ogden I*, 2006 WL 851391 at *8. The Township argued that the differential treatment afforded Reliance/Metro Phone and Ogden/Sprint was not unreasonable because the Reliance/Metro Phone application was approved before Ordinance No. 579. That argument is a *non sequitur*, and the district court properly rejected it because Ordinance No. 579 regulates the use, construction and siting of a WCF tower. The ordinance has nothing to do with deciding whether a radio tower is an accessory use to a firehouse. Moreover, rather than complicating Ogden/Sprint's request for an accessory use,

exception in R-2 Residential Districts. Zoning Ordinance § 303.7. Ogden/Sprint sought a special exception because the 15 foot height limitation imposed under § 1706.2 would otherwise have precluded erecting a 130 foot tower.

Ordinance No. 579 should have facilitated it. Thus, the enactment of Ordinance No. 579 does not explain why the Township rejected Ogden/Sprint's application while approving the application of Reliance/Metro Phone. *Id*. Here, the Township repeats the argument that it made in the district court about Ordinance No. 579. However, the argument is based on the improper characterization of the application as one filed solely by Sprint to construct a stand-alone WCF tower. The district court's holding that the Township could not rely upon Ordinance No. 579 to justify the discrimination was correct.

The district court also rejected the Township's attempt to claim that the two applications were not functionally equivalent because the proposed Ogden/Sprint tower would have a greater impact on the surrounding community. The Township argued that the area around the Reliance firehouse when the Reliance/Metrophone application was approved was very rural while the area around Ogden's property is heavily residential. The district court found to the contrary, noting:

> [T]he aerial photographs submitted by the parties do not support [the Township's] contention that the area around the Reliance firehouse was quite rural in 1990. To the contrary, those photographs show that the area around the Reliance firehouse contained a school and a sizeable residential community in 1990.

*Id*. The Township also repeats its reliance on the distinction purportedly shown in the aerial photos here. However, our review of those photographs is consistent with the findings of the district court.

Accordingly, the district court correctly held that Ogden/Sprint satisfied the first prong of the unreasonable discrimination test by establishing that although Metro Phone, like Sprint, is a provider of wireless communications services, it was treated differently than Sprint.

The district court ruled that Ogden/Sprint satisfied the second prong of the unreasonable discrimination test "by demonstrating that the structure, placement or cumulative impact of the existing Reliance/Metro Phone facility makes it more intrusive than the proposed Ogden/Sprint tower." *Id*.

67

The "Reliance/Metro Phone tower is both larger in diameter and significantly taller than the proposed Ogden/Sprint tower and . . . the neighborhoods are residential neighborhoods with identical zoning." *Id*.

On this record, the conclusion that the Zoning Board unreasonably discriminated against the Ogden/Sprint application compared to its earlier treatment of the Reliance/Metro application is inescapable.

### (3). The AT&T Wireless application

AT&T Wireless also provides wireless communication services. On November 1, 2000, *after* Ordinance No. 579 was adopted,[15] the Zoning Board approved an application submitted by AT&T Wireless. AT&T requested approval of a planned 180 foot monopole tower to be operated as a PCS cell tower antenna on land owned by the Township in an R-1 Low Density

---

[15] We stress the timing because of the Township's attempt to suggest that the enactment of Ordinance 579 somehow justifies the disparate treatment afforded the Reliance/Metro application.

Residential District.

The Zoning Board approved AT&T's application for a stand-alone WCF after concluding that it was compatible with the character of the surrounding neighborhood and in the best interest of the Township, convenience of the community and the public health, safety and welfare. The Zoning Board also concluded that allowing this special exception would not adversely affect the public health, safety and welfare and would be in accordance with the Upper Chichester Comprehensive Plan.

In granting summary judgment to Ogden/Sprint, the district court observed that the Township had submitted no evidence to justify denying Ogden/Sprint's application while approving AT&T's application. Accordingly, the court held that Ogden/Sprint met the first prong of the unreasonable discrimination test by showing that it and AT&T are functionally equivalent providers. *Id.* The court also held that Ogden/Spring met the second prong of the unreasonable

discrimination test "with respect to the AT&T application by demonstrating that the AT&T tower is more intrusive than the proposed Ogden/Sprint tower because the AT&T tower is 47 feet higher than the proposed Ogden/Sprint tower." *Id.*

Although there are some differences between the placement of the two towers (the Ogden/Sprint in a R-2 zone, and the AT&T in a R-1 zone), since the AT&T pole is much higher than the proposed Ogden/Sprint pole, and given the Zoning Board's complete failure to explain why it was willing to ignore Ordinance 579 when granting AT&T approval, the approval of the AT&T application further supports Ogden/Sprint's claim of unreasonable discrimination.

## V. TOWNSHIP'S APPEAL NO. 07-1694

As recited at the outset, after the district court granted summary judgment to Ogden and Sprint on their claims under the TCA, the Zoning Board granted the special exceptions Ogden and Sprint were requesting. However, the Township's building inspector thereafter refused to give Ogden/Sprint the

building permit that was purportedly required before they could construct the monopole. The denial was based upon the building inspector's determination that the lease of the relevant portion of Ogden's rear yard to Sprint for construction of the tower constituted a division or allocation of land by means of a leasehold. That, in turn, purportedly required the approval of a Subdivision and Land Development Application pursuant to the Township's Subdivision and Land Development Ordinance and Section 107(a) of the Pennsylvania Municipalities Planning Code ("MPC").

Apparently not feeling particularly upbeat about again trying to survive this administrative gauntlet or their chances of getting past the building inspector, Ogden/Sprint returned to district court rather than attempt to negotiate the bureaucratic rapids cascading between the Zoning Board and the final completion of the project. They asked the court to compel the issuance of a building permit. Since nothing in the record supported the Township's denial of a Subdivision and Land

71

Development Application or the issuance of a building permit, the district court ordered the Township to issue the appropriate permits for the building of the radio tower and related radio equipment, and the Township appealed.

## A. DISCUSSION

The Township's first argument is that the district court's order compelling it to issue all necessary approvals and permits for the building of the tower, impermissibly expanded the scope of its March 30, 2006 order granting summary judgment to Ogden/Sprint and ordering the Township to issue zoning permits for the tower. As we understand the Township's argument, the Township is claiming that although the TCA places limits on a local governmental unit's zoning authority, (i.e., its authority to regulate use of land), the TCA has nothing to do with a local governmental unit's subdivision authority, i.e., its authority to regulate land development. Accordingly, the Township argues that the district court improperly intruded into an area that is strictly a matter of local law in ordering

building permits for the tower. Thus, the Township claims that Ogden/Sprint must submit an application for subdivision/land development approval before it can go forward with its project even if the district court was correct in ordering the Township to issue the zoning approvals.

The argument is unavailing. It would allow an end run around the requirements of the TCA and thereby allow local regulatory agencies to subvert a federal policy by elevating zoning authority over congressional policy as enacted into law via the TCA. In *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), the Supreme Court explained that

> Congress enacted the Telecommunications Act of 1996 (TCA), to promote competition and higher quality in American telecommunications services and to "encourage the rapid deployment of new telecommunications technologies." One of the means by which it sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers. To this end, the TCA amended the Communications Act of 1934, to include § 332(c)(7), which imposes specific limitations on the traditional authority of state and local

> governments to regulate the location, construction, and modification of such facilities.

*Id*. at 115-16 (citations omitted). The Township's position, if sustained, would be fatal to telecommunication carriers attempting to build facilities in localities that did not want to allow it. It would merely shift the battle from the zoning agency to another agency charged with subdivision approval whenever the relationship between the carrier and the owner of the affected land could be viewed as falling under the jurisdiction of the latter agency. It would then remove the reach and protection of the TCA from the telecommunications provider and place the provider at the mercy of local regulators. Even if the local jurisdiction ultimately granted approval, the attendant delay, expense and uncertainty could adversely impact the provider's attempt to construct telecommunications facilities and subvert the national policy favoring it.[16]

---

[16] We note that the TCA expressly commands that any court hearing an action filed by a person adversely affected by a decision of a state or local governmental agency that is inconsistent with the TCA is to "hear and decide such action on

74

Indeed, the Township here is not arguing that Ogden/Sprint would not or should not ultimately obtain subdivision approval. Rather, the Township appears simply to want Ogden/Sprint to jump through the prescribed hurdles on its way to ultimate approval. However, as Ogden/Sprint note, it would be a pointless exercise to submit a subdivision application now because the district court has already determined, as a matter of federal law, that the Township must permit the tower to be built on Ogden's property. We conclude that the court properly ordered the issuance of the building permits as a supplemental remedy to the Township's violation of the TCA. *See Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township*, 20 F. Supp. 2d 875 (E.D. Pa. 1998) ("*Pine Grove I*"), *aff'd* 181 F.3d 403 ("*Pine Grove II*").[17]

---

an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). Congress has thus recognized the need to avoid costly and unnecessary delays during the approval process before local agencies.

[17] In *Pine Grove I*, the district court found the zoning board's denial of a special exception for a wireless communications facility was in violation of the TCA. It

The Township also argues that because subdivision issues are matters solely of state law, we must abstain pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).[18] This argument borders on frivolity and requires only the briefest discussion. "*Burford* abstention is appropriate where a difficult question of state law is presented which involves important state policies or administrative concerns." *Heritage Farms, Inc. v. Solebury Twp*, 671 F.2d 743, 746 (3d Cir. 1982) (citation omitted). However, there is no difficult question of state law here. Rather, the controlling issue is one of federal law. The issue is whether the denial of the building permits violates the TCA. We agree with the district court's conclusion that it does.

considered remanding for further administrative proceedings, but concluded that doing so "would frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis." 20 F. Supp.2d at 881. Accordingly, it ordered the following relief: "The Zoning Officer of Pine Grove Township is hereby ORDERED to issue *all necessary zoning and building permits* upon payment of any outstanding fees." *Id.* at 882 (emphasis added). We affirmed. 181 F.3d at 410.

[18] The Township did not ask the district court to abstain under *Burford*.

One matter remains. As recited, the district court noted that, under Pennsylvania law, leases that allocate land, as opposed to assigning positions on a pole or tower, constitute a subdivision or allocation of land in accordance with § 107(a) of the MPC. *Ogden II*, 2007 WL 137848 at \*2 (citing *Upper Southampton Twp. v. Upper Southampton Twp. Zoning Hearing Bd.*, 885 A.2d 85, 92 (Pa. Commw. Ct. 2005), *appeal granted*, 895 A.2d 1265 (Pa. 2006)). Ogden/Sprint contend that it is not all that clear that Pennsylvania law would require subdivision approval even in the absence of the TCA. They argue that since the Pennsylvania Supreme Court has granted leave to appeal the decision in *Upper Southampton,* there is not yet a definitive ruling on that issue under Pennsylvania law.[19]

---

[19] Ogden/Sprint also distinguish *Upper Southampton* by stressing that the Commonwealth Court was there concerned with interests in a billboard. They suggest the rationale would not apply here because (1) Ogden will occupy both the firehouse and the tower, and (2) the tower is an accessory use to the firehouse, not a separate business use. *See* Ogden/Sprint Supplemental Br. at 11 (citing 885 A.2d at 88).

However, we need not resolve that issue because our inquiry is limited to whether the district court's order requiring the Township to issue building permits for the tower is appropriate supplemental and additional relief under federal law for a violation of the TCA. We hold that it is.

## VI. CONCLUSION

For all of the above reasons, the district court's order of March 30, 2006, ordering the Township to issue all required zoning permits and variances, and the order of February 15, 2007, ordering the issuance of any required Building Permits will be affirmed.